399 S.E.2d 678

**In the Matter of Determination Pursuant to Chapter 31, Article 1, Sections 122 and 123 of the Code of West Virginia of 1931, Amended, of FAIR VALUE OF SHARES OF BANK OF RIPLEY, a West Virginia Banking Corporation Owned by Shareholders Dissenting From the Merger of Bank of Ripley with Ripley Bank Merger Subsidiary, Inc., a Subsidiary of City Holding Company.**

**No. 19609.**

Supreme Court of Appeals of West Virginia.

Nov. 13, 1990.

L. Alvin Hunt, H.F. Salsbery, Jr., Hunt and Wilson, Charleston, for Boggess, Kessel, Hoffman and Buck.

Otis L. O'Connor, Steptoe & Johnson, Charleston, Robert Fisher, Adams, Fisher & Evans, Ripley, Lathan M. Ewers, Jr., Randall S. Parks, Hunton & Williams, Richmond, Va., for City Holding Co.

MILLER, Justice:

This appeal is by shareholders who own approximately 23 percent of the common stock of the Bank of Ripley (the Shareholders). When the Bank of Ripley and a subsidiary of City Holding Company announced their intentions to merge,[1] the Shareholders sought to exercise their dissenters' rights under W.Va.Code, 31–1–123. Because the Bank and the Shareholders could not agree on the fair value of the Shareholders' stock, the Shareholders filed suit in order to resolve the issue. In an order dated July 19, 1989, the Circuit Court of Jackson County granted the Bank's motion for summary judgment on the ground that the Shareholders' failure to comply with W.Va.Code, 31–1–123(f) terminated their rights under the statute.

**1.** We will hereafter refer to the newly formed corporation as the Bank.

The chief issue presented is what effect should be given to the acknowledged reason for the Shareholders' failure to comply timely with one of the statutory steps because their legal counsel misread the statute. The lower court held that the failure to comply timely with the involved statutory step was, as a matter of law, fatal to the attempted exercise of the dissenters' rights. We disagree, and we reverse.

## I.

Because W.Va.Code, 31–1–123, is quite lengthy, we will not quote it in full in the margin, but will append it to this opinion. The following is a brief outline of its key provisions: [2]

(1) Under subsection (a), prior to or at the shareholder meeting at which the merger is to be voted upon, the dissenting shareholder (i) must file a written objection with the corporation; (ii) must not vote for the merger; and (iii) must make a written demand for the fair value of his stock within ten days after the vote is taken.[3]

(2) Under subsection (b), a demand for fair value by a dissenting shareholder cannot be withdrawn without the consent of the corporation. This subsection further outlines events which may deprive a shareholder of relief under the statute.

(3) Under subsection (c), the corporation is required within ten days after such corporate action to give written notice to each dissenting shareholder and to "make a written offer to each shareholder ... at a specified price deemed by such corporation to be fair value [of the dissenter's shares]." [4]

(4) Under subsection (d), "[i]f within thirty days after the date such corporate action is effected the fair value of such shares is agreed upon," payment for the shares shall be made within ninety days.

(5) Under subsection (e), if no agreement is reached, the dissenting shareholder must, within sixty days of the date the corporate action was effected, make a written demand that the corporation institute a lawsuit to determine the fair value of his shares. This subsection outlines court procedures and the allocation of costs.

(6) Under subsection (f), "[w]ithin twenty days after demanding payment for his shares, each shareholder demanding payment shall submit the certificate or certificates representing his shares to the corporation for notation thereon that such demand has been made." Moreover, failure to do so will "terminate his rights under this section unless a court ... for good and sufficient cause shown, shall otherwise direct."

(7) Under subsection (g), a method is provided for disposal of the shares acquired by the corporation from the dissenting shareholder.

## II.

### A.

The parties agree that the Shareholders complied with the initial steps required in W.Va.Code, 31–1–123(a), by filing a written objection before the meeting, by not voting in favor of the merger, and by making a written demand for fair value. The Bank complied with W.Va.Code, 31–1–123(c), by sending a written offer to purchase the Shareholders' stock. No agreement was reached on the fair value of the shares; thus, W.Va.Code, 31–1–123(d), was not applicable. Consequently, the Shareholders advised the Bank in writing that it should file a lawsuit to determine the fair value of the shares, as required by W.Va.Code, 31–1–123(e).

The Bank responded with a letter dated December 1, 1988, advising the Shareholders that the Bank felt that their dissenting rights had been terminated because they did not comply with W.Va.Code, 31–1–

---

**2.** We caution the reader not to rely on this summary as a comprehensive digest of the statutory requirements.

**3.** W.Va.Code, 31–1–123(a) also provides that after the written demand is made, the dissenting

shareholder "shall not be entitled to vote or to exercise any other rights of a shareholder."

**4.** W.Va.Code, 31–1–123(c) states that the offer must be accompanied by a corporate balance sheet and profit and loss statement.

123(f), which requires the dissenting shareholders to submit their certificates to the corporation for a notation that a demand for fair value has been made. This submission must be made within twenty days of the demand for payment.

To sort out these time limits, we begin with W.Va.Code, 31–1–123(a). A written demand for payment by dissenting shareholders must be made within ten days after the vote on the merger.[5] Here, the vote on the merger was on October 20, 1988, and the Shareholders made a timely written demand for payment on October 30, 1988. According to W.Va.Code, 31–1–123(f), the Shareholders should have tendered their shares for notation to the corporation within twenty days from the date of demand for payment, or by November 21, 1988.[6] The Shareholders failed to meet this deadline, as the Bank correctly advised them by letter dated December 1, 1988.

Within four days after the Bank's December 1 letter, the Shareholders and their attorney met with the Bank's president. While disagreeing with the Bank's interpretation of W.Va.Code, 31–1–123(f), the Shareholders offered to tender their shares for notation, approximately fifteen days after the November 21 deadline. The Bank rejected this offer. Subsequently, the Shareholders filed this civil action to enforce their dissenters' rights.

**B.**

At common law, in the absence of a specific statute, the merger or consolidation of a corporation or the sale of substantially all of the corporation's assets required the unanimous consent of its shareholders. *E.g., Voeller v. Neilston Warehouse Co.,* 311 U.S. 531, 61 S.Ct. 376, 85 L.Ed. 322 (1941); *Salomon Bros., Inc. v. Interstate Bakeries Corp.,* 576 A.2d 650 (Del.Ch.1989), *appeal refused,* 571 A.2d 787 (1990); *Waters v. Double L, Inc.,* 114 Idaho 256, 755 P.2d 1294 (1987), *decision affirmed,* 115 Idaho 705, 769 P.2d 582 (1989). *Cf. Anderson v. International Minerals & Chem. Corp.,* 295 N.Y. 343, 67 N.E.2d 573 (1946). *See generally* 18A Am. Jur.2d *Corporations* § 805 (1985 & Supp. 1990). In 1931, by statute, we abrogated the common law rule requiring unanimous consent of the shareholders. *See* W.Va. Code, 31–1–63 (1931). *See also* W.Va.Code, 31–1–117 (1974). Prior to the enactment of our dissenter's rights statute, W.Va.Code, 31–1–123, a shareholder had no legal means to dissent from a corporate merger, consolidation, or sale of assets or to obtain the fair value of his shares. This section grants statutory rights to shareholders who wish to dissent from any of the corporate actions described in W.Va.Code, 31–1–122.[7]

---

5. Where the corporation merges without a vote of its shareholders, W.Va.Code, 31–1–123(a), provides a different time frame.

6. Because the twentieth day fell on a weekend, the Shareholders had until Monday, November 21, 1988, to tender their shares for notation pursuant to W.Va.Code, 2–2–3 (1973), which provides:

   "The time or period prescribed or allowed within which an act is to be done shall be computed by excluding the first day and including the last; or if the last be a Saturday, Sunday or legal holiday, it shall also be excluded, and any such Saturday shall be a legal holiday solely for the purpose of Rule 6(a) of the Rules of Civil Procedure for Trial Courts of Record; but the provisions of this section shall not be deemed to change any rule of law applicable to bills of exchange or negotiable notes."

7. W.Va.Code, 31–1–122, provides:

   "Any shareholder of a corporation shall have the right to dissent from any of the following corporate actions:

   "(a) Any plan or merger or consolidation to which the corporation is a party; or

   "(b) Any sale or exchange of all or substantially all of the property and assets of the corporation not made in the usual and regular course of its business, including a sale in dissolution, but not including a sale pursuant to an order of a court having jurisdiction in the premises or a sale for cash on terms requiring that all or substantially all of the net proceeds of sale be distributed to the shareholders in accordance with their respective interests within one year after the date of sale.

   "A shareholder may dissent as to less than all of the shares registered in his name. In that event, his rights shall be determined as if the shares as to which he has dissented and his other shares were registered in the names of different shareholders."

Courts have developed several general rules regarding dissenter's rights statutes. The first is that ordinarily such a statute provides the exclusive remedy for a dissenting shareholder [8] in the absence of a showing of fraud, unfairness, or illegality.[9] *See, generally* 18A Am.Jur.2d *Corporations* § 809. Although our statute does not contain any specific provisions as to exclusivity, we agree with the general rule. Second, dissenter's rights statutes are construed favorably toward the shareholder, particularly where there is no prejudice to the corporation. As a corollary, such statutes are given a reasonable construction rather than a rigid and technical one. Doubts arising from a lack of precision or accuracy in the statute should, where possible, be resolved in favor of the dissenting shareholder.[10]

### C.

The chief issue presented is whether the fifteen-day delay in tendering their stock for notation under W.Va.Code, 31–1–123(f), should result in a forfeiture of the Shareholders' rights. We note initially that subsection (f) does not impose an automatic forfeiture of a dissenter's rights. Two circumstances can prevent a forfeiture. First, the corporation has the option not to terminate the shareholder's rights. Second, if the corporation does elect to terminate the dissenter's rights, a court can still excuse the shareholder's noncompliance for good and sufficient cause.[11]

The Bank asserts a relatively simple argument that the statute is clear and unambiguous and that the dissenters' failure to follow it cannot be excused because they can show no good and sufficient cause. The Bank also claims that it will suffer prejudice if the dissenters prevail because the merger agreement required 90 percent of the shareholders to approve so that the merger would qualify for "pooling-of-interests" accounting treatment. If this accounting treatment is lost, the Bank will allegedly suffer adverse financial consequences.

The Shareholders' position is that the statute is complex and that their attorney's misreading of this provision should, when coupled with the short delay in tendering their stock for notation, constitute good and sufficient cause. Moreover, the Shareholders contend that the Bank's claim of prejudice must be viewed in light of the events existing on the effective date of the merger, October 21, 1988. At that time, the Bank was already aware of the dissenters' claim, knew that it would prevent pooling-of-interests treatment, and nonetheless elected to proceed with the merger. Consequently, the Shareholders argue that the Bank had accepted the adverse accounting impact of the merger before the Shareholders failed to comply timely with W.Va. Code, 31–1–123(f).

8. *Langfelder v. Universal Laboratories,* 68 F.Supp. 209 (D.Del.1946), *aff'd,* 163 F.2d 804 (3d Cir.1947); *Jones v. Highway Inn, Inc.,* 424 So.2d 944 (Fla.App.1983); *Sandfield v. Goldstein,* 33 A.D.2d 376, 308 N.Y.S.2d 25 (1970), *aff'd,* 28 N.Y.2d 794, 321 N.Y.S.2d 904, 270 N.E.2d 723 (1971); *Pritchard v. Mead,* 155 Wis.2d 431, 455 N.W.2d 263 (App.), *review denied,* 458 N.W.2d 533 (Wis.1990).

9. *Joseph v. Shell Oil Co.,* 498 A.2d 1117 (Del.Ch. 1985); *Rosenstein v. CMC Real Estate Corp.,* 168 Ill.App.3d 92, 118 Ill.Dec. 766, 522 N.E.2d 221 (1988); *Yeager v. Paul Semonin Co.,* 691 S.W.2d 227 (Ky.App.1985); *Joseph v. Wallace–Murray Corp.,* 354 Mass. 477, 238 N.E.2d 360 (1968); *Sifferle v. Micom Corp.,* 384 N.W.2d 503 (Minn. App.1986); *BankEast Corp. v. Galdi,* 125 N.H. 280, 480 A.2d 136 (1984); *Loengard v. Sante Fe Indus., Inc.,* 70 N.Y.2d 262, 519 N.Y.S.2d 801, 514 N.E.2d 113 (1987); *Klurfeld v. Equity Enters., Inc.,* 79 A.D.2d 124, 436 N.Y.S.2d 303 (1981).

10. *Huntsville Indus. Assocs., Inc. v. Cummings,* 292 Ala. 391, 295 So.2d 251 (1974); *Greco v. Tampa Wholesale Co.,* 417 So.2d 994 (Fla.App. 1982), *review denied,* 431 So.2d 990 (Fla.1983); *Sarrouf v. New England Patriots Football Club, Inc.,* 397 Mass. 542, 492 N.E.2d 1122 (1986); *Bache & Co. v. General Instrument Corp.,* 42 N.J. 44, 198 A.2d 759 (1964); *Bohrer v. United States Lines Co.,* 92 N.J.Super. 592, 224 A.2d 348 (1966). *See generally* 18A Am.Jur.2d *Corporations* § 807.

11. The precise language of W.Va.Code, 31–1–123(f), as to these conditions is: "His failure to do so shall, at the option of the corporation, terminate his rights under this section unless a court of general civil jurisdiction, for good and sufficient cause shown, shall otherwise direct."

We agree with the Shareholders that the dissenter's rights statute is not a model of clarity.[12] Logic would dictate that subsection (f) should follow subsection (a) in sequence, and, thereby clearly identify the mandatory steps a dissenting shareholder must take to exercise his rights. Furthermore, subsection (b), which attempts to summarize some of the events that affects a dissenter's right to relief, does not describe the provisions of subsection (f).[13]

We need not, however, determine whether the misreading of the statute by the Shareholders' attorney constitutes good cause. Several courts that have considered statutes similar to W.Va.Code, 31–1–123(f), have held that where the delay is insubstantial and no prejudice results to the corporation, there is not good and sufficient cause to terminate the dissenter's rights.

A typical case is *Greco v. Tampa Wholesale Co.*, 417 So.2d 994 (Fla.App.1982), *review denied*, 431 So.2d 990 (Fla.1983), where the dissenting shareholders were fifteen days late in tendering their shares for notation. The Florida court concluded that this delay was not substantial and that the corporation was not prejudiced because "the other stockholders and the corporate officers were acutely aware at all times of the appellants' position." 417 So.2d at 997. Accordingly, the court refused to terminate the dissenting shareholders' rights.

*Greco* relied heavily on *Sasseen v. Danco Industries, Inc.*, 20 A.D.2d 657, 246 N.Y. S.2d 440 (1964), where the dissenting shareholders were obligated to file their shares for notation by February 25, 1963. They did not do so, but instead filed a suit to determine the value of their shares on March 21, 1963. Though the notation requirement was completely bypassed, the court upheld the dissenters' rights because:

"Throughout this interval of time the corporation had no reason to believe that

petitioners would relinquish their right to appraisal and to demand payment. Denial of relief to petitioners would result in substantial prejudice to them. They would be deprived of their right to payment and would be relegated to their status as minority stockholders. It is undisputed that respondent is a close corporation and there is no market in its shares. On the other hand, the corporation has not been prejudiced whatsoever." 20 A.D.2d at 657–58, 246 N.Y.S.2d at 441–42.

A similar result was reached in *In Re Davis*, 59 Misc.2d 1098, 301 N.Y.S.2d 340 (1969), *aff'd*, 33 A.D.2d 1100, 308 N.Y.S.2d 107 (1970), in which the court found that a twenty-five-day delay in filing a petition requesting a determination of the value of stock was not prejudicial to the corporation because it had no reason to believe that the shareholder was withdrawing his demand for payment.

The Texas statute is also similar to ours in requiring tender of stock for notation. In *Parkview General Hospital, Inc. v. Waco Construction, Inc.*, 531 S.W.2d 224 (Tex.Civ.App.1975), the dissenting shareholder was twenty-eight days late in submitting his shares for notation. The court rejected the corporation's claim that the dissenter's rights were terminated and stated: "[T]he defendant failed to object to plaintiff's failure to strictly comply with the statute.... [D]efendant did not exercise its option to terminate plaintiff's rights.... And finally, defendant did not show that non-compliance prejudiced it in any manner." 531 S.W.2d at 228. (Citation omitted).

The Bank argues that *Greco* and *Sasseen* are distinguishable because the dissenting shareholders in those cases kept in continual contact with the corporation. In this case, the Bank points out that there

---

**12.** For example, the authors of a note analyzing the 1974 amendments to the corporation statute, W.Va.Code, 31–1–1, *et seq.*, outlined the dissenter's rights statute, but overlooked subsection 123(f). Note, *Corporations—A Survey of the Pending West Virginia Corporation Act,* 77 W.Va. L.Rev. 50, 138–39 (1974).

**13.** W.Va.Code, 31–1–123(b), provides that "a court of general civil jurisdiction [may] determine that such shareholder is not entitled to the relief provided by this section." Although subsection (b) mentions the time constraints in subsection (e), it does not refer to subsection (f).

was a twenty-day hiatus between the written demand and any contact over the failure to submit the stock for notation.

■ We do not see merit in this distinction. First, there is no "continual contact" requirement in W.Va.Code, 31–1–123. Second, and more importantly, the courts in *Greco* and *Sasseen* did not hold that contact was a requirement under their dissenter's statutes. *Greco* and *Sasseen* mentioned the shareholders' contact with the corporations as evidence that the corporations knew the dissenting shareholders were still pursuing their rights. Under W.Va.Code, 31–1–123(b), once a shareholder dissents, he cannot withdraw his dissent unless the corporation consents or the other conditions outlined in this subsection are met. Thus, the statute gives notice to the corporation that after a dissenter exercises his statutory rights, he is "locked in" to the process.

The Bank cites *In Re Glosser Bros., Inc.*, 382 Pa.Super. 177, 555 A.2d 129 (1989), and *Pritchard v. Mead,* 155 Wis.2d 431, 455 N.W.2d 263 (App.), *review denied,* 458 N.W.2d 533 (Wis.1990), in support of its position that dissenter's rights should be denied when the shareholder has failed to tender his shares for notation in accordance with the statutory time frame. In neither of these cases did the shareholders attempt to tender their shares. For example, in *Pritchard,* the court observed: "As of the filing of this appeal, however, Pritchard had not submitted his stocks to the corporation for notation on them of his demand, nor does he offer any explanation for that omission." 155 Wis.2d at 439, 455 N.W.2d at 267. *Application of Wiedersum,* 41 Misc.2d 936, 246 N.Y.S.2d 638 (1964), relied upon by the Bank, is similarly inapposite because the shareholders delayed six months before they submitted their stock for notation.

We are not confronted, however, with egregious inaction. A bare four days after the Bank wrote the Shareholders, rejecting their claim under subsection (f), the Shareholders met with the Bank president and attempted to tender their shares for notation. Here, delay was a mere fifteen days.

We do not believe *Sarrouf v. New England Patriots Football Club, Inc.,* 397 Mass. 542, 492 N.E.2d 1122 (1986), cited by the Bank, supports its position. *Sarrouf* involved the dissenting shareholder's failure to file an objection when the merger vote was taken. The Massachusetts statute did not have a proviso allowing the court to find good cause to excuse the dissenter's failure to object. Nonetheless, the Supreme Judicial Court of Massachusetts recognized the liberal construction that should be afforded the act: "The statute is designed to provide an equitable, simple, and expeditious remedy to dissenting shareholders. It should not be construed strictly against them." 397 Mass. at 552, 492 N.E.2d at 1129.

■ Consistent with the foregoing cases, we hold that where a dissenting shareholder has otherwise complied with the provisions of W.Va.Code, 31–1–123, but has failed to timely tender his shares for notation as required by subsection (f) of the foregoing statute, his failure will not terminate his dissenter's rights if the delay is insubstantial and the corporation is shown not to have suffered any prejudice.

### III.

■ Finally, we address the Bank's claim that it will be prejudiced if the Shareholders are allowed to proceed. If it has to pay the Shareholders in cash, as is required under W.Va.Code, 31–1–123, the Bank loses the pooling-of-interests accounting benefit. Specifically, the merger would have to be considered a purchase method acquisition,[14]

---

**14.** H. Sellin, *Attorney's Handbook of Accounting* p. 11–26 (3d ed. 1987), briefly describes the difference between the two accounting methods: "The purchase method accounts for a business combination as the acquisition of one company by another. The acquiring corporation records as its cost the acquired assets, less liabilities assumed. A difference between the cost of an acquired company and the sum of the fair values of tangible and identifiable assets less liabilities is recorded as goodwill....

"A pooling of interests, on the other hand, is a combination of two or more businesses

and the Bank would have to report the business's "goodwill," which will have to be amortized, thereby affecting the Bank's earnings.

The problem with this argument is that there was always an inherent risk of losing the pooling-of-interests advantage if there were dissenting shareholders. Indeed, this risk was recognized in the proxy statement outlining the merger agreement, which provided that if 90 percent of the Ripley common stock was not exchanged, the pooling-of-interests accounting method would not be available. However, the statement went on to advise that if, before the "effective date" of the merger, pooling-of-interests proved unavailable, the proxies of Ripley shareholders would be resolicited, with a new *pro forma* financial statement based on the purchase accounting method.[15] This latter language expresses a clear intent to merge even though the transaction may not qualify for pooling-of-interests treatment.

The parties agree that the effective date of the merger was October 21, 1988, the day following the shareholders' meeting. There is no question that prior to the share-holders' meeting and the effective date of the merger, shareholders owning 23 percent of the outstanding shares of the Bank of Ripley common stock had given formal written notice that they dissented from the merger.[16]

There is language in the proxy statement that conditions City Holding's obligation to complete the merger on receipt of a letter from an accounting firm that the "merger will qualify for pooling-of-interests accounting treatment."[17] Moreover, in the "Termination" section, City Holding is given the right to terminate the merger prior to the effective date "if holders of more than 5% of the Ripley Common Stock provide notice of their intent to exercise dissenter's rights."[18]

This aspect of the merger was not addressed by the parties below in any detail. The Bank filed an affidavit by Steven J. Day, the assistant secretary and chief financial officer of City Holding Company. Day acknowledged that October 21, 1988, was the effective date of the merger. He went on to give information about the adverse financial impact on the merger if it

where there is uniting of the ownership interest by the exchange of equity securities. No acquisition is recognized because the combination is accomplished without disbursing resources of the constituents. Ownership interests continue and the former bases of accounting are retained. The recorded assets and liabilities of the constituents are carried forward to the combined corporation at their reported amounts."

**15.** The relevant language is found on page 28 of the proxy statement, under the heading "Conditions to Consummation of the Merger":

"The Merger is expected to be treated as a pooling-of-interests for accounting purposes in accordance with general accepted accounting principles.... In order for the Merger to qualify for pooling-of-interests accounting treatment, 90% or more of the outstanding Ripley Common Stock must be exchanged for City Holding Common Stock....

"Should City Holding discover that the Merger will not qualify for pooling-of-interests accounting treatment prior to the Effective Date, the proxies of Ripley shareholders will be resolicited with an amended proxy statement, containing pro forma financial statements based on the purchase accounting method."

We recognize that the proxy statement provided only a summary of the merger agreement. The actual merger agreement is not a part of the record before us.

**16.** The record before us does not disclose whether the proxies of the Ripley shareholders were "resolicited with an amended proxy statement, containing pro forma financial statements based on the purchase accounting method." *See* note 15, *supra.*

**17.** The precise language from page 28 of the proxy statement is: "The obligation of City Holding to consummate the Merger is also conditioned upon the absence of any material adverse change in the financial condition or the results of operations of Ripley and the receipt of a letter from Ernst & Whinney that the Merger will qualify for pooling-of-interests accounting treatment."

**18.** The relevant language from page 29 of the proxy statement reads:

"The Agreement may be terminated and the Merger abandoned at any time prior to the Effective Date, notwithstanding approval by Ripley shareholders, as follows: ... (iv) by City Holding if holders of more than 5% of Ripley Common Stock provide notice of their intent to exercise dissenter's rights[.]"

were given purchase rather than pooling-of-interests accounting. The affidavit does not refer to the language from the merger agreement giving City Holding the right to terminate the merger if the pooling-of-interests requirement could not be met. The affidavit does not attempt to explain why City Holding went forward with the merger with 23 percent of the stock in a dissenting position.

Waiver and estoppel loom over the Bank's pressing of the pooling-of-interests prejudice argument. It decided not to avoid the merger even though there was no foreseeable ability to use pooling-of-interest treatment at that time. It was not until approximately forty days after the effective date of the merger that any question was raised about the validity of the dissenters' rights. From the rather abbreviated record, the question becomes whether the Bank's initial election to consummate the merger should now constitute a waiver of its allegation of prejudice.

Other courts have considered concepts of waiver and estoppel to dissenter's rights problems. *See Salomon Bros., Inc. v. Interstate Bakeries Corp., supra* (waiver and estoppel); *Aaron Rents, Inc. v. Corr,* 133 Ga.App. 296, 211 S.E.2d 156 (1974) (waiver); *Acree v. E.I.F.C., Inc.,* 502 S.W.2d 43 (Ky.App.1973) (estoppel); *Waters v. Double L, Inc., supra* (estoppel). *See generally* 18A Am.Jur.2d *Corporations* § 824; Annot., 40 A.L.R.3d 260, 284 (1971). We recently summarized the doctrines of waiver and estoppel in Syllabus Point 2 of *Ara v. Erie Insurance Co.,* 182 W.Va. 266, 387 S.E.2d 320 (1989):

> "Although the doctrines of waiver and estoppel are both grounded in equity, they differ significantly in application. To effect a waiver, there must be evidence which demonstrates that a party has intentionally relinquished a known right. Estoppel applies when a party is induced to act or to refrain from acting to her detriment because of her reasonable reliance on another party's misrepresentation or concealment of a material fact."

We reverse the trial court's granting of the Bank's motion for summary judgment. However, because the record is not adequately developed, we are unable to make a conclusive judgment on the waiver of prejudice issue. As a consequence, we remand the case for further development on this point.

Reversed and remanded.

### APPENDIX

### WEST VIRGINIA CODE 1966

### CHAPTER 31. CORPORATIONS.

### ARTICLE 1. BUSINESS AND NON-PROFIT CORPORATIONS.

#### PART III. BUSINESS CORPORATIONS.

§ 31-1-123. Rights of dissenting shareholders; procedure for purchasing of dissenting shareholders' shares; civil action for determining value of shares; procedure for transferring of such shares to corporation and payment therefor.

(a) Any shareholder electing to exercise his right to dissent, pursuant to section one hundred twenty-two [s 31-1-122] of this article, shall file with the corporation, prior to or at the meeting of shareholders at which such proposed corporate action is submitted to a vote, a written objection to such proposed corporate action. If such proposed corporate action be approved by the required vote and such shareholder shall not have voted in favor thereof, such shareholder may, within ten days after the date on which the vote was taken or if a corporation is to be merged without a vote of its shareholders into another corporation, any of its shareholders may, within fifteen days after the plan of such merger shall have been mailed to such shareholders, make written demand on the corporation, or, in the case of a merger or consolidation, on the surviving or new corporation, domestic or foreign, for payment of the fair value of such shareholder's shares, and, if such proposed corporate action is effected, such corporation shall pay to such

shareholder, upon surrender of the certificate or certificates representing such shares, the fair value thereof as of the day prior to the date on which the vote was taken approving the proposed corporate action, excluding any appreciation or depreciation in anticipation of such corporate action. Any shareholder failing to make demand within the ten-day period shall be bound by the terms of the proposed corporate action. Any shareholder making such demand shall thereafter be entitled only to payment as in this section provided and shall not be entitled to vote or to exercise any other rights of a shareholder.

(b) No such demand may be withdrawn unless the corporation shall consent thereto. If, however, such demand shall be withdrawn upon consent, or if the proposed corporate action shall be abandoned or rescinded or the shareholders shall revoke the authority to effect such action, or if, in the case of a merger, on the date of the filing of the articles of merger the surviving corporation, is the owner of all the outstanding shares of the other corporations, domestic and foreign, that are parties to the merger, or if no demand or petition for the determination of fair value by a court of general civil jurisdiction have been made or filed within the time provided in subsection (e) of this section, or if a court of general civil jurisdiction shall determine that such shareholder is not entitled to the relief provided by this section, then the right of such shareholder to be paid the fair value of his shares shall cease and his status as a shareholder shall be restored, without prejudice to any corporate proceedings which may have been taken during the interim.

(c) Within ten days after such corporate action is effected, the corporation, or, in the case of a merger or consolidation, the surviving or new corporation, domestic or foreign, shall give written notice thereof to each dissenting shareholder who has made demand as herein provided, and shall make a written offer to each shareholder to pay for such shares at a specified price deemed by such corporation to be fair value thereof. Such notice and offer shall be accompanied by a balance sheet of the corporation the shares of which the dissenting shareholder holds, as of the latest available date and not more than twelve months prior to the making of such offer, and a profit and loss statement of such corporation for the twelve months' period ended on the date of such balance sheet.

(d) If within thirty days after the date on which such corporate action is effected the fair value of such shares is agreed upon between any such dissenting shareholder and the corporation, payment therefor shall be made within ninety days after the date on which such corporate action was effected, upon surrender of the certificate or certificates representing such shares. Upon payment of the agreed value the dissenting shareholder shall cease to have any interest in such shares.

(e) If within such period of thirty days, a dissenting shareholder and the corporation do not so agree, then the corporation shall within thirty days after receipt of written demand from any dissenting shareholder, which written demand must be given within sixty days after the date on which such corporate action was effected, file a complaint in a court of general civil jurisdiction requesting that the fair value of such shares be found and determined, or the corporation may file such complaint at any time within such sixty-day period at its own election. Such complaint shall be filed in any court of general civil jurisdiction in the county in which the principal office of the corporation is situated, or, if there be no such office in this State, in the county in which any dissenting shareholder resides or is found or in which the property of such corporation, or any part of it, may be. If the corporation shall fail to institute such proceedings, any dissenting shareholder may do so in the name of the corporation. All dissenting shareholders wherever residing, may be made parties to the proceedings as an action against their shares quasi in rem. A copy of the complaint shall be served on each dissenting

shareholder who is a resident of this State in the same manner as in other civil actions. Dissenting shareholders who are nonresidents of this State shall be served a copy of the complaint by registered or certified mail, return receipt requested. In addition, service upon such nonresident shareholders shall be made by publication, as provided in Rule 4(e)(2) of the West Virginia Rules of Civil Procedure. All shareholders who are parties to the proceeding shall be entitled to judgment against the corporation for the amount of the fair value of their shares. The court may, if it so elects, appoint one or more persons as appraisers to receive evidence and recommend a decision on the question of fair value. The appraisers shall have such power and authority as shall be specified in the order of their appointment or any subsequent appointment. The judgment shall be payable only upon and concurrently with the surrender to the corporation of the certificate or certificates representing such shares. Upon payment of the judgment, the dissenting shareholder shall cease to have any interest in such shares.

The judgment shall include an allowance for interest at such rate as the court may find to be fair and equitable in all the circumstances, from the date on which the vote was taken on the proposed corporate action to the date of payment.

The costs and expenses of any such proceeding shall be determined by the court and shall be assessed against the corporation, but all or any part of such costs and expenses may be apportioned and assessed as the court may deem equitable against any or all of the dissenting shareholders who are parties to the proceeding to whom the corporation shall have made an offer to pay for the shares if the court shall find that the action of such shareholders in failing to accept such offer was arbitrary or vexatious or not in good faith. Such expenses shall include reasonable compensation for and reasonable expenses of the appraisers, but shall exclude the fees and expenses of counsel for and experts employed by any party; but if the fair value of the shares as determined materially exceeds the amount which the corporation offered to pay therefor, or if no offer was made, the court in its discretion may award to any shareholder who is a party to the proceeding such sum as the court may determine to be reasonable compensation to any expert or experts employed by the shareholder in the proceeding. Any party to the proceeding may appeal any judgment or ruling of the court as in other civil cases.

(f) Within twenty days after demanding payment for his shares, each shareholder demanding payment shall submit the certificate or certificates representing his shares to the corporation for notation thereon that such demand has been made. His failure to do so shall, at the option of the corporation, terminate his rights under this section unless a court of general civil jurisdiction, for good and sufficient cause shown, shall otherwise direct. If shares represented by a certificate on which notation has been so made shall be transferred, each new certificate issued therefor shall bear similar notation, together with the name of the original dissenting holder of such shares, and a transferee of such shares shall acquire by such transfer no rights in the corporation other than those which the original dissenting shareholder had after making demand for payment of the fair value thereof.

(g) Shares acquired by a corporation pursuant to payment of the agreed value therefor or to payment of the judgment entered therefor, as in this section provided, may be held and disposed of by such corporation as in the case of other treasury shares, except that, in the case of a merger or consolidation, they may be held and disposed of as the plan of merger or consolidation may otherwise provide.